**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **DENNIS W. YOUNG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 1:06CV126 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Dennis W. Young for Disability Insurance Benefits under Title II of the

Social Security Act, and Supplemental Security Income under Title XVI of the Act. This case has

been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice

Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has

filed a Brief in Support of Plaintiff's Complaint. (Document Number 10). Defendant has filed a

Brief in Support of the Answer. (Doc. No. 11).

**Procedural History**

On October 16, 2003, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on August 8, 2002. (Tr. 88-90, 131-32). This

---

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time
Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue
became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action.
See Fed.R.Civ.P. 25(d)(1).

claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 31, 2006. (Tr. 83-87, 94, 120-23, 9-25). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on July 12, 2006. (Tr. 7, 3-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on August 11, 2005. (Tr. 394). Plaintiff was present and was represented by counsel. (Id.). Plaintiff's girlfriend, Tracy Klein, and vocational expert Gary Weimholt were also present. (Id.).

The ALJ noted that plaintiff's date last insured was December 31, 2003, and was thus expired at the time of the hearing. (Id.). The ALJ admitted a number of exhibits into the record. (Tr. 395).

Plaintiff's attorney then made an opening statement. (Tr. 396-97). Plaintiff's attorney stated that plaintiff meets or equals the listing due to his IQ and his physical problems. (Tr. 396). Plaintiff's attorney stated that plaintiff's illiteracy and chronic back pain preclude him from performing any work in the national economy. (Id.). Plaintiff's attorney stated that plaintiff is unable to read or write and his girlfriend completed all the documents submitted in the matter. (Tr. 397). Plaintiff's attorney requested that the ALJ hold the record open for thirty days so that he could obtain plaintiff's school records. (Id.). The ALJ indicated that he would allow plaintiff's attorney time to obtain plaintiff's school records. (Id.).

The ALJ then examined plaintiff, who testified that he was fifty-one years of age and single. (Id.). Plaintiff stated that he lives with his girlfriend, Tracy Klein, who is thirty-seven years of age. (Tr. 398). Plaintiff testified that Ms. Klein does not work outside the home but she receives disability benefits. (Id.). Plaintiff stated that he did not know the nature of Ms. Klein's disability. (Id.). Plaintiff testified that he met Ms. Klein at a friend's house and he has been with her for two years. (Id.).

Plaintiff stated that he completed the twelfth grade but he cannot read or write. (Tr. 399). Plaintiff testified that he took special education classes. (Id.). Plaintiff stated that he was able to get his driver's license because he had his driver's license test read to him. (Id.). Plaintiff testified that he did not pass the driver's license test the first time he took it. (Id.). Plaintiff stated that he had to take the test twice. (Id.). Plaintiff testified that he did not have a driver's license at the time of the hearing because he received a DWI. (Id.).

Plaintiff stated that he worked for the City of Poplar Bluff for twenty-five years, four months, and four days. (Id.). Plaintiff testified that he worked as a laborer in the cemetery. (Tr. 400). Plaintiff stated that he last worked for the City of Poplar Bluff in 1998 or 1999. (Id.). Plaintiff testified that he was fired from this position because he tested positive for cocaine. (Id.). Plaintiff stated that he was not using cocaine at the time of the hearing. (Id.). Plaintiff testified that he last used cocaine about five years prior to the hearing, after he was fired form his job. (Tr. 400-401).

Plaintiff stated that he was right-hand dominant. (Tr. 401). Plaintiff testified that he was five feet, eight inches tall and weighed 135 pounds. (Id.). Plaintiff stated that he has never been in the military. (Id.). Plaintiff testified that he has been in jail three times. (Id.). Plaintiff stated

that the longest amount of time he spent in jail was thirty days when he was arrested for DWI. (Id.). Plaintiff testified that he has had three DWIs. (Id.). Plaintiff stated that he did not believe the third DWI conviction was a felony. (Tr. 402). Plaintiff testified that he had not consumed alcohol in two years. (Id.).

Plaintiff stated that he has no source of income and that he lives with his girlfriend. (Id.). Plaintiff testified that he receives food stamps. (Id.). Plaintiff stated that he also receives Medicaid benefits. (Id.). Plaintiff testified that his girlfriend supports him. (Id.).

Plaintiff stated that he uses his Medicaid card to see his doctors. (Id.). Plaintiff testified that the last time he saw a doctor was August 2, 2005. (Tr. 403). Plaintiff stated that he saw Dr. Bennie Till, his regular physician, at that time. (Id.). Plaintiff testified that he has been seeing Dr. Till for four or five years. (Id.). Plaintiff stated that Dr. Till's office is in Poplar Bluff. (Id.). Plaintiff testified that he went to high school in Poplar Bluff. (Id.).

Plaintiff stated that he worked as a laborer in the cemetery the entire twenty-five years that he worked for the City of Poplar Bluff. (Id.). Plaintiff testified that he cleaned ditches, mowed grass, and dug graves at this position. (Tr. 404). Plaintiff stated that the graves were dug by machine. (Id.). Plaintiff testified that it was someone else's job to dig the graves but he occasionally helped. (Id.). Plaintiff stated that the heaviest item he had to lift at this job was a ten pound shovel. (Id.). Plaintiff testified that he shoveled dirt and cleaned out ditches. (Id.). Plaintiff stated that in the fall, he raked the ditches. (Id.). Plaintiff testified that in the summer, he mowed grass and trimmed. (Tr. 405). Plaintiff stated that he operated a riding mower while sitting. (Id.). Plaintiff testified that he used a weed eater to do the trimming. (Id.). Plaintiff stated that he shoveled graves about once or twice a week. (Id.). Plaintiff testified that about

three employees shoveled graves at a time.  (Id.).  Plaintiff explained that a backhoe digs the graves and covers them and the employees flatten the dirt.  (Tr. 406).

Plaintiff testified that he would have had to work for the City of Poplar Bluff thirty years to retire.  (Id.).  Plaintiff stated that he hoped to work at this position until he retired.  (Tr. 407).  Plaintiff testified that if the City of Poplar Bluff offered him his job back, he would not be able to accept the job.  (Id.).  Plaintiff stated he would not be able to perform the position because he is short of breath, his chest hurts, and his hear is enlarged.  (Id.).  Plaintiff testified that he has been to Lucy Lee Hospital for his heart problems.  (Id.).  Plaintiff stated that he was last at Lucy Lee Hospital about a year prior to the hearing as an outpatient, at which time he had a heart scan.  (Id.).  The ALJ indicated that he did not have any records from Lucy Lee Hospital.  (Tr. 408).  Plaintiff's attorney stated that he was unable to obtain these records because plaintiff did not pay $57.93 in pre-paid costs.  (Id.).  Plaintiff's attorney requested that the Office of Hearings and Appeals obtain these records.  (Id.).

Plaintiff testified that he does not smoke and that he quit smoking about two years prior to the hearing.  (Id.).  Plaintiff stated that he does not use alcohol.  (Id.).  Plaintiff testified that he last consumed alcohol when he got his last DWI.  (Tr. 409).  Plaintiff stated that the cough syrup that his doctor prescribed has some alcohol in it.  (Id.).  Plaintiff testified that he last used marijuana, cocaine, meth, or any other street drugs four to five years prior to the hearing.  (Id.).

Plaintiff stated that his girlfriend drove him to the hearing.  (Id.).  Plaintiff testified that he is unable to read or write.  (Id.).

Plaintiff stated that he has never pled guilty or been found guilty of a felony.  (Id.).  Plaintiff testified that his was not on probation or parole at the time of the hearing.  (Tr. 410).

Plaintiff stated that he spends his days at home watching television and walking to the park. (Id.). Plaintiff testified that he did not know the amount of his girlfriend's monthly disability benefits. (Id.). Plaintiff stated that his girlfriend was with him at the hearing. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he experiences constant pain in his lower back, shoulders, and legs. (Id.). Plaintiff stated that he has had this pain for six or seven years. (Id.). Plaintiff testified that the pain started after he was run over by a trailer at work. (Id.). Plaintiff stated that he has pins in his legs from the work accident. (Tr. 411). Plaintiff testified that the pins in his legs cause pain that comes and goes. (Id.). Plaintiff rated the pain in his legs as a seven on a scale of one to ten. (Id.). Plaintiff rated his back pain as a five. (Id.). Plaintiff stated that he takes pain medication. (Id.). Plaintiff testified that the medication eases his pain but it does not eliminate the pain. (Id.). Plaintiff stated that he could not work with his pain. (Tr. 412).

Plaintiff testified that he has difficulty walking. (Id.). Plaintiff stated that he cannot walk far due to the pins in his legs. (Id.). Plaintiff testified that he can walk about a mile. (Id.).

The ALJ then questioned plaintiff, who testified that his pain is mostly in his lower back, the top of his shoulders, his left ankle, and his right thigh. (Id.). Plaintiff stated that he has pins in his left ankle but not his right thigh. (Tr. 413). Plaintiff testified that he did not injure his right thigh in the same incident. (Id.). Plaintiff stated that a trailer ran over his ankle. (Id.). Plaintiff testified that he was sitting on the back of a trailer that was hauling dirt and his foot was hanging off the trailer. (Id.). Plaintiff stated that he broke his ankle. (Tr. 414). Plaintiff testified that he missed about six weeks of work after injuring his ankle. (Id.). Plaintiff stated that this was the only time he was injured on the job. (Id.).

Plaintiff testified that he injured his right thigh in a motorcycle accident in 1977. (Id.). Plaintiff stated that he had a motorcycle license in 1977. (Id.). Plaintiff testified that he can bend over and touch his knees but he cannot touch his toes. (Tr. 415). Plaintiff stated that he cannot stoop down and get back up because his thigh starts hurting. (Id.). Plaintiff testified that it would be difficult to lift and carry ten pounds of dirt because his legs and ankles are bad. (Id.).

Plaintiff stated that he has arthritis in his shoulders. (Id.). Plaintiff testified that he has difficulty pushing and pulling things. (Id.). Plaintiff stated that he has a throbbing pain in both of his shoulders. (Tr. 416). Plaintiff testified that he does not have any trouble with his hands. (Id.). Plaintiff stated that he has undergone x-rays of his shoulders at [Kniebert] Clinic. (Id.). Plaintiff testified that he saw Dr. Till about a month ago, at which time he underwent x-rays of his shoulders. (Id.). Plaintiff stated that he also underwent x-rays of his chest at that time. (Tr. 417).

Plaintiff's attorney indicated that he did not have Dr. Till's recent records. (Id.). Plaintiff's attorney requested that the Office of Hearings and Appeal obtain these records because plaintiff was unable to pay for them. (Id.). The ALJ stated that he would discuss this issue later in the proceedings. (Tr. 418).

Plaintiff testified that he has difficulty breathing. (Id.). Plaintiff stated that x-rays revealed a spot on his lungs. (Id.). Plaintiff testified that he uses an inhaler about three times a day because he has shortness of breath. (Id.). Plaintiff stated that he has difficulty breathing during hot weather. (Tr. 419). Plaintiff testified that cold weather aggravates his arthritis. (Id.). Plaintiff stated that he has more pain when it is cold. (Id.).

Plaintiff testified that he does not do any housework for his girlfriend. (Id.). Plaintiff stated that he does not do any yard work. (Id.). Plaintiff testified that he helps with the grocery

shopping.  (Id.).  Plaintiff stated that he does not have any difficulty in the grocery store.  (Id.).

Plaintiff testified that he could probably lift a twenty-pound bag of groceries but his girlfriend

usually lifts the heavy items.  (Tr. 420).

The ALJ then examined Tracy Klein, who testified that she was plaintiff's girlfriend.  (Tr.

421).  Ms. Klein stated that she lives with plaintiff and her four children.  (Tr. 422).  Ms. Klein

testified that only the youngest child is plaintiff's.  (Id.).  Ms. Klein stated that she has been with

plaintiff for two years and that plaintiff lives in her house.  (Id.).

Ms. Klein testified that she receives SSI benefits for her depression.  (Id.).  Ms. Klein

stated that she did not have a hearing with an ALJ.  (Id.).

Ms. Klein testified that she completed the twelfth grade.  (Id.).  Ms. Klein stated that she

was in special education classes in the seventh grade through the twelfth grade.  (Tr. 423).  Ms.

Klein testified that she can read and write but she cannot comprehend.  (Id.).  Ms. Klein stated

that she comprehends well enough to help plaintiff with his paperwork.  (Id.).

Ms. Klein testified that plaintiff has not worked in the three years that he has lived with

her.  (Id.).  Ms. Klein stated that plaintiff has problems with his heart, liver, arthritis, and joints,

which prevent him from working.  (Id.).  Ms. Klein testified that plaintiff experiences heartburn.

(Tr. 424).  Ms. Klein stated that on a typical day, plaintiff sits and watches television and then

gets up and walks around.  (Id.).  Ms. Klein testified that she met plaintiff through mutual friends.

(Id.).

Ms. Klein stated that she takes plaintiff to doctor appointments.  (Id.).  Ms. Klein testified

that she has a driver's license.  (Id.).  Ms. Klein stated that she had to take the written portion of

the driver's license test two times.  (Id.).  Ms. Klein testified that she went to high school in Cuba,

Missouri.  (Id.).

Ms. Klein stated that she is supporting plaintiff.  (Id.).  Ms. Klein testified that plaintiff's worst medical problems are his back pain and chest pains.  (Tr. 425).  Ms. Klein stated that plaintiff also has headaches, stomach pain, leg pain, and arm pain.  (Id.).

Ms. Klein stated that plaintiff does not consume alcohol.  (Id.).  Ms. Klein testified that plaintiff last consumed alcohol four weeks prior to the hearing.  (Id.).  Ms. Klein stated that plaintiff received his last DWI two to three years prior to the hearing.  (Id.).  Ms. Klein testified that plaintiff did not stop drinking when he received the last DWI.  (Id.).  Ms. Klein stated that plaintiff quit drinking four weeks prior to the hearing because he was getting headaches when he drank.  (Tr. 426).

The ALJ next examined the vocational expert, Gary Weimholt, who testified that he did not know plaintiff or his case.  (Id.).  Mr. Weimholt stated that he had heard plaintiff's testimony and had reviewed the exhibits.  (Id.).  Mr. Weimholt described plaintiff's past work with the City of Poplar Bluff as grounds caretaker, which is an unskilled job usually performed at a medium physical demand level.  (Tr. 427).  Mr. Weimholt stated that the position has the alternative titles of park worker, campground caretaker, or landscape specialist.  (Id.).  Ms. Weimholt testified that he does not believe plaintiff was performing the position of cemetery worker.  (Id.).  Mr. Weimholt described the position of grounds caretaker as unskilled and simple.  (Id.).

The ALJ then re-examined plaintiff, who testified that he did not know why he told the ALJ that he last consumed alcohol after his third DWI.  (Id.).  Plaintiff stated that he quit drinking four weeks prior to the hearing, as his girlfriend stated.  (Tr. 428).  Plaintiff testified that he has not lied about anything else at the hearing.  (Id.).  Plaintiff stated that he quit drinking four weeks

prior to the hearing because he was having headaches. (Tr. 429). Plaintiff testified that he was drinking a half pint of whiskey and a twelve-pack of beer a week. (Id.). Plaintiff stated that he thought the alcohol was causing his headaches so he stopped drinking. (Id.). Plaintiff testified that he also quit drinking because he takes blood pressure medication. (Id.). Plaintiff stated that he still takes blood pressure medication daily. (Id.). Plaintiff testified that Dr. Till prescribed the blood pressure medication. (Id.).

The ALJ then re-examined Ms. Klein, who testified that her monthly income is $1300.00. (Tr. 430). Ms. Klein stated that this amount includes her disability benefits, the disability benefits her son receives from having cerebral palsy, and Temporary Assistance for Needy Families (TANF). (Id.). Ms. Klein testified that she also receives food stamps. (Tr. 431). Ms. Klein stated that she does not smoke. (Id.). Ms. Klein testified that when plaintiff drank, he drank whiskey, which costs about $2.00 for a half pint, and a twelve-pack of beer, which costs about $7.00. (Id.).

Ms. Klein stated that plaintiff has a doctor's appointment in St. Louis at the end of the month. (Id.). Ms. Klein testified that plaintiff is seeing a liver specialist. (Tr. 432). Ms. Klein stated that Dr. Till referred him to the specialist. (Id.).

The ALJ indicated that he was denying plaintiff's request to obtain plaintiff's medical records. (Tr. 433). The ALJ stated that the $57.00 that is required to obtain the records amounts to about two months of plaintiff's alcohol use. (Id.). The ALJ stated that if this money was available for purchase of alcohol, the money should be available to obtain the medical records. (Id.). The ALJ requested that plaintiff's attorney obtain records from Dr. Till. (Id.). The ALJ indicated that he would leave the record open for thirty days and that he would grant plaintiff

additional time if requested.  (Tr. 434).

**B.**     **Relevant Medical Records**

Plaintiff presented to D.K. Varma, M.D. on March 2, 2001, for a consultation.  (Tr. 362-
65).  Plaintiff complained of pain in both legs below the hip joints for the past two years and pain
in the right side of the abdomen for about three months.  (Tr. 362).  Dr. Varma noted that plaintiff
underwent an operation for excision of skin cancer in the middle of the left side of the abdomen.
(Id.).  Dr. Varma also noted that plaintiff had sustained an ankle fracture four years prior, for
which he was treated.  (Id.).  Plaintiff was not taking any medication at the time.  (Tr. 363).
Plaintiff had no shortness of breath or chest pain.  (Id.).  Plaintiff had full range of motion of the
extremity joints, although they were painful.  (Tr. 364).  Dr. Varma's impression was:
hypertension,[2] probably essential, untreated; history of fracture of the left ankle, treated with
surgery; history of fracture of the right thigh twelve years prior; history of skin cancer on the left
side of the abdomen, excised; mild clubbing of the finer nails; and chronic right upper quadrant
abdominal pain, cause undetermined.  (Id.).  Dr. Varma noted that there was some joint pain on
the left ankle but no swelling, tenderness, inflammation, or joint abnormality.  (Id.).  He stated
that plaintiff's gait was normal without any assistive devices.  (Id.).  Dr. Varma stated that there is
no evidence of any neurological abnormality.  (Id.).  He noted that plaintiff's ability to perform
work-related functions cannot be evaluated without proper evaluation of plaintiff's untreated
hypertension.  (Tr. 365).

Plaintiff presented to Licensed Clinical Psychologist Steve Larsen on March 6, 2001, for
an evaluation.  (Tr. 370-72).  Plaintiff reported that he was unable to read although he was

---

[2]High blood pressure.  Stedman's Medical Dictionary, 927 (28th Ed. 2006).

capable of cooking, light cleaning, and doing the laundry. (Tr. 370). Plaintiff indicated that he

was sociable and outgoing and enjoys being around people. (Id.). Plaintiff stated that he had

never had any mental health treatment. (Id.). Dr. Larsen administered the Wechsler Adult

Intelligence Scale-Third Edition (WAIS-III) IQ test, which revealed a Verbal IQ of 71, a

Performance IQ of 64, and a Full Scale IQ of 65. (Tr. 371). Dr. Larson stated that plaintiff's

Verbal IQ score is in the borderline range,[3] and his Performance and Full Scale IQ scores are in

the mildly retarded[4] range of estimated intelligence. (Id.). Dr. Larson stated that although

plaintiff was functioning in the mildly retarded range of estimated intelligence, his adaptive

functioning is somewhat higher than that, so he likely would not be diagnosed with mild mental

retardation because that diagnosis is based on both significant delays in self-care and IQ scores in

the mildly retarded range. (Id.). Dr. Larson stated that plaintiff had good attention,

concentration, and memory skills during the exam, which suggests that he could work at a job

that requires sustained attention and concentration. (Id.). Dr. Larson's diagnostic impression

was: low end of the borderline range of intellectual functioning and current GAF[5] of 70.[6] (Tr.

---

[3]Borderline intellectual functioning is defined by an IQ in the 71-84 range. See Diagnostic
and Statistical Manual of Mental Disorders (DSM-IV), 684 (4th Ed. 1994).

[4]Mild mental retardation is defined by an QI of 50 to 55 to approximately 70. See DSM-
IV at 46.

[5]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool
wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness" which does "not include impairment in
functioning due to physical (or environmental) limitations." DSM-IV at 32.

[6]A GAF score of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild
insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional
truancy, or theft within the household), but generally functioning pretty well, has some meaningful
interpersonal relationships. DSM-IV at 32.

372).

Plaintiff presented to W.H. Elliott, M.D. at the Kneibert Clinic on January 21, 2002, with complaints of recurrent episodes of chest pain, which Dr. Elliott described as probably anginal in nature. (Tr. 339). Plaintiff also reported shortness of breath and high blood pressure. (Id.). Dr. Elliott noted that plaintiff was seen a few weeks prior for a lung infection, which was treated with an antibiotic. (Id.). Upon physical examination, plaintiff's blood pressure was very high, his lungs were clear, and he had a regular heart rate and rhythm without murmur. (Id.). Dr. Elliott's assessment was chest pain suggestive of new onset angina,[7] uncontrolled hypertension, recent hematuria,[8] and dyspnea[9] that may represent some underlying degree of congestive heart failure or lung dysfunction. (Id.). Dr. Elliott stated that plaintiff needed extensive further testing and expressed the opinion that plaintiff be considered disabled for a one-year period so he can undergo testing. (Id.).

The record reveals that plaintiff presented to the Bernie Medical Clinic with various complaints, including blood in his urine, chest pain, heartburn, cough, and left shoulder pain, from January 2002 through May 2002. (Tr. 343-53).

Plaintiff saw K.L. Turner, M.D. at the Kneibert Clinic on June 3, 2002. (Tr. 338). Plaintiff complained of shoulder pain and marked limitation of motion in his shoulders. (Id.). Dr. Turner noted that plaintiff had recently been hospitalized for chest pain that radiated into the shoulder. (Id.). It was noted that plaintiff has a history of hypertension and abdominal pain

---

[7]A severe, often constricting pain or sensation of pressure. Stedman's at 85.

[8]Presence of blood in the urine. Stedman's at 864.

[9]Shortness of breath. Stedman's at 601.

secondary to gastroesophageal reflux disease (GERD).[10]  (Id.).  Dr. Turner noted that plaintiff

also has a history of Hepatitis C.[11]  (Id.).  Upon physical examination, plaintiff's blood pressure

was in the normal range.  (Id.).  Dr. Turner stated that plaintiff was scheduled to have an

abdominal ultrasound.  (Id.).  Dr. Turner indicated that he would get plaintiff an appointment with

the hepatologist regarding his Hepatitis C but he needed to see his liver function studies first.

(Id.).

Plaintiff presented to the Kneibert Clinic on July 3, 2002, with complaints of left shoulder

pain.  (Tr. 327).  Plaintiff underwent an abdominal ultrasound, which revealed a small hiatal

hernia[12] with mild gastroesophageal reflux and a normal appearing stomach.  (Tr. 331).  Plaintiff

also underwent a gallbladder ultrasound, which was within normal limits.  (Tr. 330).

Plaintiff saw Paul D. King, M.D., on October 3, 2002, for evaluation of his hepatitis C.

(Tr. 297-98).  Dr. King stated that plaintiff had no history of acute hepatitis.  (Tr. 297).  Plaintiff

reported chest pain, shortness of breath, and left arm pain.  (Id.).  Plaintiff was evaluated by a

cardiologist, who recommended tests but did not feel that his symptoms were angina.  (Id.).

Upon physical examination, plaintiff's skin, heart, and lungs were normal.  (Id.).  Plaintiff's liver

---

[10]A syndrome due to structural or functional incompetence of the lower esophageal
sphincter, which permits retrograde flow of acidic gastric juice into the esophagus.  Stedman's at
556.

[11]Caused by a virus that is classified with the Flaviviridae family.  The incubation period is
six to eight weeks with about 75 percent of infections subclinical and giving rise to chronic
persistent infection.  A high percentage of these develop chronic liver disease leading to cirrhosis.
See Stedman's at 877.

[12]Hernia of a part of the stomach through the esophageal hiatus of the diaphragm.
Stedman's at 880.

was soft, smooth, and non-tender, with no evidence of ascites.[13]  (Id.).  Laboratory data

confirmed a positive hepatitis C antibody test and mildly elevated liver enzymes.  (Id.).  Dr. King

scheduled plaintiff for a liver biopsy and indicated that he would make a decision about treatment

after obtaining those results.  (Id.).

In a letter dated December 17, 2002, Dr. King stated that plaintiff's liver biopsy

demonstrated changes of hepatitis C with mild inflammation and a moderate amount of scar, but

no tumor or cirrhosis.  (Tr. 293).  Dr. King stated that the hepatitis C has caused some permanent

damage, which has been fairly mild.  (Id.).  Dr. King indicated that it was difficult to predict what

would happen in ten to twenty years.  (Id.).  He recommended antiviral medications to eliminate

the virus, although he noted that the medications have a significant number of potential side

effects.  (Id.).

Plaintiff saw Gary Dausmann, M.D. on June 30, 2003, with complaints of abdominal pain.

(Tr. 323).  Dr. Dausmann's impression was abdominal pain, suspect peptic ulcer[14] disease.  (Id.).

He prescribed Nexium[15] and scheduled an upper GI and ultrasound of the gallbladder.  (Id.).

Plaintiff underwent an ultrasound of the abdomen, which revealed no abnormalities.  (Tr. 322).

Plaintiff presented to Chul Kim, M.D. for an internist examination on December 29, 2003.

(Tr. 287-92).  Plaintiff's chief complaints were listed as: heart problem, stomach problem, liver

problem, leg problem, and learning disorder.  (Tr. 287).  Upon physical examination of the joints

---

[13]Accumulation of serous fluid in the peritoneal cavity.  Stedman's at 165.

[14]Ulcer of the alimentary mucosa, usually in the stomach, exposed to acid gastric secretion.  Stedman's at 2062.

[15]Nexium is indicated for the treatment of GERD.  See Physician's Desk Reference (PDR), 621 (57th Ed. 2003).

and extremities, plaintiff had limited range of motion with pain in the left shoulder, otherwise his examination was unremarkable. (Tr. 290). Plaintiff's gait was stable, he was able to bear full weight on both legs, walk on his heels and toes, get on and off the examining table, and squat without significant problem. (Id.). Dr. Kim's impression was: once in the emergency room, he was told that his heart was enlarged; probable peptic ulcer disease, recently he passed dark blood in stool; probable gastroesophageal reflux disease; hepatitis C that has not been treated; history of injury in both lower extremities that required multiple surgeries and he gets pain in both lower extremities off and on; and learning disorder. (Id.).

Plaintiff underwent a chest x-ray at the Kneibert Clinic on January 16, 2004, which revealed benign granulomatous[16] change without evidence of active pulmonary disease. (Tr. 319). Plaintiff underwent chest x-rays again on April 13, 2004, which revealed no change from January 16, 2004, and no acute cardiopulmonary abnormalities. (Tr. 303). Plaintiff also underwent pulmonary function tests, which revealed moderate pulmonary obstruction. (Tr. 315).

Plaintiff presented to the Kneibert Clinic on February 25, 2005, with complaints of chest pain. (Tr. 284). Plaintiff also complained of gas/bloating, indigestion/heartburn, back pain, muscle cramps, muscle weakness, stiffness, and arthritis. (Tr. 285). Upon examination, plaintiff had a regular heart rate and rhythm, without murmurs. (Id.). Plaintiff had some joint tenderness and back tenderness. (Id.). He had normal reflexes, coordination, and muscle strength. (Id.). Plaintiff had a depressed affect, was anxious, and had poor concentration. (Id.). The impression

---

[16]Term applied to nodular inflammatory lesions, usually small or granula, firm, persistent, and containing compactly grouped modified phagocytes. Stedman's at 831.

of Bennie N. Till, M.D. was: minor diagnosis of pharyngitis,[17] abdominal pain, GERD, and degenerative joint disease.[18]  (Tr. 286).  Dr. Till recommended that plaintiff exercise, follow a low-fat diet, get plenty of rest, take Ibuprofen for pain relief, and continue his medications.  (Id.).

Plaintiff saw Dr. Till on March 25, 2005, with complaints of chest pain.  (Tr. 281). Plaintiff reported that he was awakened by severe pressure in the mid chest, he felt weak, nauseated, and short of breath.  (Id.).  Plaintiff also reported that he had recently seen blood in his urine.  (Id.).  Upon physical examination, plaintiff had a regular heart rate and rhythm, without murmurs, rubs, or gallops.  (Tr. 282).  Dr. Till's impression was hepatitis, and all chronic illnesses are stable.  (Id.).

Plaintiff saw Dr. Till for a follow-up visit on April 27, 2005, at which time plaintiff's chief complaint was coughing, with chest pain.  (Tr. 278).  Dr. Till's impression was: asthma, some wheezing mostly at night; hepatitis C, chronic, stable with no jaundice;[19] back pain, chronic; and abdominal pain, with no increase in pain and liver not enlarged or tender.  (Tr. 279).

Plaintiff saw Dr. Till on May 24, 2005, with complaints of facial pain and headaches.  (Tr. 276).

Plaintiff saw Dr. Till for a follow-up visit on June 22, 2005.  (Tr. 262).  Plaintiff reported

---

[17]Inflammation of the mucous membrane and underlying parts of the pharynx.  Stedman's at 1473.

[18]A synonym for osteoarthritis, which is arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints.  See Stedman's at 1388.

[19]A yellowish staining of the integument, sclerae, deeper tissues, and excretions with bile pigments, resulting from increased levels in the plasma.  Stedman's at 1010.

pain in his left side that radiated to his chest, and pain in both arms. (Id.). Plaintiff also complained of anorexia, weakness, nasal congestion, sore throat, chest pain on exertion, cough, nausea, abdominal pain, back pain, and anxiety. (Tr. 263). Dr. Till's impression was chest pain. (Tr. 264). Plaintiff underwent chest x-rays, which revealed no active cardiac or pulmonary disease. (Tr. 246). Plaintiff also underwent an EKG, which revealed sinus bradycardia[20] and left ventricular hypertrophy.[21] (Tr. 245).

Plaintiff presented to Dr. Till on July 20, 2005, with complaints of headache and chest pain. (Tr. 258). Dr. Till noted that plaintiff has no neurological symptoms or signs. (Id.). Dr. Till indicated that plaintiff had an unremarkable stress test less than a year prior to his appointment and that he attempted a treadmill stress test a month prior and was unable to tolerate it. (Id.). Dr. Till stated that plaintiff's chest pain probably represents chest wall pain. (Id.). Dr. Till's impression was: hepatits C, chronic, has been stable; GERD, stable with reflux; chest pain, findings consistent with chest wall pain; and degenerative joint disease. (Tr. 259).

Plaintiff saw Dr. Till on July 28, 2005, with complaints of chest pain and pain under his right shoulder. (Tr. 250). Dr. Till's impression was: hepatitis C, chronic, will refer for consultation; chest pain, chest x-ray was okay; and hypertension, will add Hydrochlorothiazide.[22] (Tr. 251).

Plaintiff presented to Dr. Till on August 1, 2005, with complaints of a cough, nausea, and

---

[20]Slowness of the heartbeat originating in the normal sinus pacemaker. Stedman's at 249.

[21]Increase in the size of the left ventricle. See Stedman's at 929.

[22]Hydrochlorothiazide is indicated for the treatment of hypertension. See PDR at 2523.

nasal congestion.  (Tr. 247).  Dr. Till's impression was bronchitis.[23]  (Tr. 249).

Plaintiff presented to Dr. Till on August 29, 2005, with complaints of chest tightness, back and shoulder pain, and some shortness of breath.  (Tr. 236).  Dr. Till's impression was hepatitis C chronic, has seen hepatologist, who recommended a colonoscopy; and abdominal pain.  (Tr. 237). Dr. Till scheduled a colonoscopy.  (Tr. 238).

Plaintiff underwent pulmonary function tests at the Kneibert Clinic on August 29, 2005, which revealed severe pulmonary obstruction.  (Tr. 240-241, 243, 376-379).

Dr. Till completed a Physical Residual Functional Capacity Assessment on September 15, 2005.  (Tr. 267-72).  Dr. Till expressed the opinion that plaintiff could sit for six hours in an eight-hour workday, stand for three hours in an eight-hour workday, walk for three hours in an eight-hour workday, and work for three hours in an eight-hour workday.  (Tr. 267).  Dr. Till found that plaintiff could frequently lift up to ten pounds, occasionally lift up to twenty pounds, and could never lift more than twenty pounds.  (Id.).  Dr. Till stated that plaintiff can frequently carry up to twenty pounds, and can never carry more than twenty pounds.  (Id.).  Dr. Till indicated that plaintiff could not use his left foot for repetitive movements as in operating foot controls.  (Tr. 268).  Dr. Till found that plaintiff is able to frequently bend and reach above, but cannot squat, crawl, climb, stoop, crouch, or kneel.  (Id.).  Dr. Till stated that plaintiff's degenerative joint disease, hepatitis C, and back pain could be expected to produce pain.  (Tr. 269).  Dr. Till found that plaintiff could be exposed to noise continuously; could occasionally be around moving machinery, and drive automotive equipment; and could never be exposed to unprotected heights, marked temperature changes, or be exposed to dust, fumes, and gases.  (Tr.

---

[23]Inflammation of the mucous membrane of the bronchi.  Stedman's at 270.

270).  Dr. Till indicated that plaintiff has reduced range of motion of the back, which is an objective indicator of pain.  (Tr. 271).  Dr. Till noted that plaintiff has the following subjective indications of pain: complaints of pain, sleeplessness, irritability, poor interpersonal relationships, and depression.  (Id.).  Dr. Till indicated that plaintiff's depression, weakness, and hepatitis C, serve as medical reasons that plaintiff should not work.  (Tr. 272).

Plaintiff saw Stacy L. Sayuk, a Certified Physician's Assistant, at the Washington University School of Medicine Hepatology Program, on February 16, 2006.  (Tr. 390-91).  Ms. Sayuk stated that plaintiff was encouraged to see a psychiatrist, and that he saw psychiatrist Dr. Debbie Price for the first time the day prior to his appointment.  (Tr. 390).  Ms. Sayuk stated that Dr. Price increased plaintiff's Remeron.[24]  (Id.).  Ms. Sayuk indicated that plaintiff continues to experience suicidal ideations a couple of time per week, but denies suicide attempts.  (Id.).  Ms. Sayuk stated that plaintiff's dyspnea has worsened and he is requesting he be placed on oxygen therapy.  (Id.).  She reported that plaintiff developed abdominal swelling and pain a month ago, which has been associated with a fifteen-pound weight gain.  (Id.).  Upon physical examination, plaintiff was well-developed, well-nourished, and in no apparent distress.  (Id.).  Plaintiff had a regular heart rate and rhythm, with no murmurs.  (Id.).  Ms. Sayuk stated that plaintiff is a potential candidate for treatment with Interferon[25] and Ribavirin,[26] however, the etiology of his dyspnea is clear and his depressive symptoms have not been stabilized.  (Tr. 391).  Ms. Sayuk

---

[24]Remeron is indicated for the treatment of major depressive disorder.  See PDR at 2402.

[25]Interferon is indicated for the treatment of chronic Hepatitis C.  See PDR at 2921.

[26]Ribavirin is indicated in combination of Interferon injection for the treatment of chronic Hepatitis C in patients with compensated liver disease previously untreated with Interferon or who have relapsed following Interferon therapy.  See PDR at 3073.

indicated that treatment could cause anemia, and worsen plaintiff's psychiatric symptoms. (Id.). Ms. Sayuk stated that she did not believe plaintiff's abdominal swelling and pain are due to ascites. (Id.). She ordered a CT scan of the abdomen and chest. (Id.). Ms. Sayuk stated that she would communicate with plaintiff's psychiatrist regarding the progress being made with his depressive symptoms. (Id.). Ms. Sayuk indicated that she would see plaintiff again in approximately four months. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.  The claimant met the disability insured status requirements of the Social Security Act on August 8, 2002. The claimant has not engaged in substantial gainful activity since at least August 8, 2002.

2.  The claimant has hypertension, a "small" hiatal hernia, mild gastroesophageal reflux disease and histories of left shoulder capsulitis and prostatitis. However, these have not been severe singularly or in combination with other impairments, for twelve consecutive months in duration and despite treatment. The claimant has Hepatitis C. However, such has not been severe for twelve consecutive months in duration. The claimant has a history of a diagnosis of chronic obstructive pulmonary disease. However, such has not been severe, singularly or in combination with other impairments, for twelve consecutive months in duration and despite treatment. The claimant has a history of a diagnosis of degenerative joint disease but such is not bolstered by diagnostic testing and the treatment records with respect to objective signs and symptoms. Any degenerative joint disease that the claimant may have has not been severe for twelve months in duration. The claimant has a history of complaints of depression and anxiety but does not have severe medically determinable impairments of such lasting twelve months in duration. The claimant does have borderline intellectual functioning.

3.  The claimant does not have an impairment or combination of impairments listed in, or medically equal to, the appropriate listings set forth in Appendix 1, Subpart P, Regulations No. 4.

4.  The allegations of symptoms, or combination of symptoms, of such severity as to preclude all types of work activity are not consistent with the evidence as a whole and are not persuasive.

5. The claimant's impairments preclude: frequently lifting and carrying more than ten pounds; occasionally lifting and carrying more than twenty pounds; standing and/or walking more than six hours in an eight hour wok day; sitting more than six hours out of a n eight hour work day; and performing more than simple repetitive work.

6. The claimant cannot perform his past relevant work. The claimant is a younger individual with a high school [education]. He has a reported history of special education.

7. In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

8. The claimant can perform other work existing in significant numbers. This finding is based upon the credible testimony of the vocational expert. Examples and numbers of jobs have been cited in the body of the decision.

9. The claimant has been able to perform other work, existing in significant numbers, since August 8, 2002. The claimant has been able to perform substantial gainful activity since August 8, 2002. The claimant was not under a disability, as defined under the Social Security Act, at any time through the date of this decision.

(Tr. 23-24).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the applications filed on October 16, 2003, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits, and is not eligible for Supplemental Security Income Benefits, under Sections 216(i) and 223, and 1614(a)(3)(A), respectively, of the Social Security Act.

(Tr. 24-25).

## Discussion

### A. Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial

gainful employment." If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges

from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C. Plaintiff's Claims

Plaintiff raises four claims on appeal of the decision of the Commissioner. Plaintiff first argues that the ALJ erred in failing to consider whether plaintiff's impairments met or equaled a Listing. Plaintiff next argues that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitation. Plaintiff also argues that the ALJ erred in formulating plaintiff's residual functional capacity. Plaintiff finally argues that the hypothetical presented to the vocational expert was erroneous. The undersigned will discuss plaintiff's claims in turn.

## 1. Listing

Plaintiff argues that the ALJ erred in failing to consider whether plaintiff's chronic obstructive pulmonary disease, as well as his borderline intellectual functioning/mild mental retardation meet or equal a Listing. Defendant contends that the ALJ properly determined that plaintiff does not have a Listing-level impairment.

The burden of proof is on the plaintiff to establish that his or her impairment meets or

equals a listing.  <u>Johnson v. Barnhart</u>, 390 F.3d 1067, 1070 (8th Cir. 2004).  To meet a listing, an impairment must meet all of the listing's specified criteria.  <u>Id.</u>  An impairment that manifests only some of these criteria, no matter how severely, does not qualify.  <u>Id.</u> (quoting <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)).  Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion.  <u>Pepper ex rel. Gardner v. Barnhart</u>, 342 F.3d 853, 855 (8th Cir. 2003).

Plaintiff first argues that he meets or equals Listing 3.02, the Listing for pulmonary insufficiency, based on his symptoms of dyspnea, his August 2005 pulmonary function tests, and his recent diagnosis of severe pulmonary obstruction.  To satisfy the requirements of Listing 3.02, pulmonary function tests must reveal forced expiratory volume (FEV1) or forced vital capacity (FVC) values equal to or less than those listed in tables provided in the Listing.  <u>See</u> 20 C.F.R. Part 404, Supt P, App. 1, § 3.02.  The FEV1 and FVC values vary based upon the claimant's height.  <u>See id.</u>  Plaintiff is 68 inches tall.  (Tr. 240).  Based on this height, pulmonary function tests must reveal FEV1 values of 1.45 or less or FVC values of 1.65 or less to satisfy Listing 3.02. <u>See</u> <u>id.</u>

Plaintiff's August 2005 pulmonary function tests revealed a maximum FEV1 value of 1.56 and a maximum FVC value of 2.32.  (Tr. 240).  Pulmonary function tests plaintiff underwent in January 2004 revealed a maximum FEV1 value of 1.79 and a maximum FVC value of 2.85.  (Tr. 315).  At this time, plaintiff was diagnosed with only moderate pulmonary obstruction.  (<u>Id.</u>).  Thus, plaintiff's argument that his pulmonary obstruction meets or equals Listing 3.02 fails.

Plaintiff next argues that he meets or equals Listing 12.05C, the Listing for mental retardation, based on his March 2001 full-scale IQ score of 65.

Listing 12.05 provides as follows:

> 12.05 *Mental Retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ***
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. pt. 404, subpt. P, App. 1 at 472 (emphasis in original). The requirements in the introductory paragraph of Listing 12.05 are mandatory. Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). As such, to meet Listing 12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. See id.

Dr. Larsen administered the WAIS-III IQ test on March 6, 2001, which revealed a full scale IQ score of 65. (Tr. 371). Dr. Larsen indicated that plaintiff's scores were in the mildly retarded range of estimated intelligence. (Id.). As such, plaintiff clearly satisfies the first requirement of Listing 12.05C. In addition, respondent does not dispute that plaintiff satisfies the third requirement due to his physical impairments. Respondent contends that plaintiff does not satisfy the second requirement of Listing 12.05C because he has not demonstrated deficits in adaptive functioning.

Although plaintiff's IQ scores were within the mildly retarded range, Dr. Larsen did not

diagnose him with mild mental retardation. (Tr. 371-72). Dr. Larsen noted that plaintiff's adaptive functioning was somewhat higher than that of mild mental retardation. (Tr. 371). Dr. Larsen also stated that plaintiff did not have a history of difficulty getting along with people and that he was able to perform most self-care functions at an age-appropriate level. (Id.). Dr. Larsen found that plaintiff had good attention, concentration, and memory skills during the exam, which suggests that he could work at a job that requires sustained attention and concentration. (Id.). Further, as the ALJ pointed out, plaintiff worked as a cemetery worker for 26 years at the substantial gainful activity level before losing this job not due to his mental defects but because he tested positive for cocaine. (Tr. 14, 400).

The undersigned finds that plaintiff has failed to demonstrate deficits in adaptive functioning. Thus, petitioner's claim that he meets or equals Listing 12.05C fails.

**2.      Credibility Analysis**

Plaintiff argues that the ALJ erred in assessing the credibility of his subjective allegations of pain and limitation. Defendant contends that the ALJ conducted a proper credibility analysis and found plaintiff's subjective complaints to be not entirely credible.

    "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective

allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the <u>Polaski</u> factors." <u>Kelley</u>, 133 F.3d at 588. <u>Polaski</u> requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. <u>Polaski</u>, 739 F.2d at 1322. <u>See also</u> <u>Burress</u>, 141 F.3d at 880; 20 C.F.R. § 416.929.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when []he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work." <u>Benskin v. Bowen</u>, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In her opinion, the ALJ specifically cited the relevant <u>Polaski</u> factors. (Tr. 13). The ALJ then properly pointed out <u>Polaski</u> factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first discussed plaintiff's allegation of a disabling cognitive impairment. The ALJ noted that the medical evidence does not support the presence of a disabling mental impairment. (Tr. 14). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. <u>See</u> <u>Curran-Kicksey v. Barnhart</u>, 315 F.3d 964, 968 (8th Cir.

2003).  The ALJ pointed out that, although WAIS-III testing revealed a full scale IQ of 65, the Dr. Larsen noted that plaintiff's adaptive functioning was higher than mild mental retardation. (Tr. 14, 371).  Dr. Larsen did not diagnose plaintiff with mild mental retardation.  (Tr. 371).

The ALJ next stated that plaintiff was able to work for twenty-six years despite any cognitive deficits or learning disabilities.  (Tr. 14).  The ALJ pointed out that plaintiff left this position not due to any cognitive deficits, but because test screening was positive for cocaine. (Id.).  He stated that there is no objective medical evidence of plaintiff's cognitive functioning worsening since the time he was fired from his job.  (Id.).  The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of disabling pain.  See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).

Finally, the ALJ stated that although plaintiff was directed to submit his high school transcript, he did not do so.  (Tr. 14).  The ALJ noted that plaintiff's failure to submit his transcript does not bode well for his credibility.  (Id.).

The ALJ next discussed plaintiff's allegations of disabling physical impairments.  The ALJ conducted an exhaustive summary of the medical evidence.  With regard to plaintiff's respiratory impairment, the ALJ stated that plaintiff only periodically complained of chest pain.  (Tr. 16). The ALJ noted that chest x-rays from January 2004 revealed no evidence of active pulmonary disease.  (Tr. 16, 319).  Pulmonary function tests revealed only moderate pulmonary obstruction, and on January 27, 2004, plaintiff reported that he was breathing better.  (Tr. 311, 315). Although plaintiff complained of chest pain on February 25, 2005, upon examination plaintiff had a regular heart rate and rhythm, without murmurs, and his lungs were clear to auscultation.  (Tr. 285).  Dr. Till recommended that plaintiff exercise and follow a low-fat diet at this tie.  (Tr. 286).

Plaintiff had a regular heart rate and rhythm without murmurs, rubs, or gallops on March 25, 2005. (Tr. 281). Plaintiff underwent chest x-rays on June 22, 2005, which revealed no active cardiac or pulmonary disease. (Tr. 246). Plaintiff complained of chest wall pain on July 20, 2005, at which time his heart rate and rhythm were normal, his lungs were clear to auscultation, and he had a normal respiratory effect. (Tr. 258). On July 28, 2005, plaintiff's heart rate and rhythm were regular, his lungs were clear to auscultation, and he had a normal respiratory effect. (Tr. 251). Dr. Till noted at this time that plaintiff's chest x-ray was "okay." (Tr. 251). Based on this medical evidence, the ALJ concluded that the objective findings, especially the findings of normal respiratory effort and repeated findings of no acute distress, are "very inconsistent" with plaintiff's allegations of a disabling respiratory impairment. (Tr. 17).

The ALJ next discussed plaintiff's plaintiff's degenerative joint disease. Plaintiff saw Dr. Kim for a consultative examination on December 29, 2003. (Tr. 287-92). Plaintiff had limited range of motion only in his left shoulder, otherwise his examination was unremarkable. (Tr. 290). Plaintiff's gait was stable, he was able to bear full weight on both legs, he had full strength in his upper and lower extremities, he was able to walk on his heels and toes, get on and off the examining table, and squat without significant problem. (Id.). A neurological examination also revealed no abnormalities. (Id.). Plaintiff complained of "back pain, muscle cramps, muscle weakness, stiffness, and arthritis," on February 25, 2005. (Tr. 285). Plaintiff denied any difficulty walking. (Id.). Upon physical examination, Dr. Till noted some back and joint tenderness, but no other abnormalities. (Id.). Dr. Till found that plaintiff had normal reflexes, coordination, and muscle strength. (Id.). Plaintiff was found to have no musculoskeletal deformities or scoliosis, normal posture and gait, normal reflexes, normal coordination, normal muscle strength, and no

clubbing or edema in his extremities at his office visits in June 2005, July 2005, and August 2005. (Tr. 237, 258, 264, 279).

The ALJ also pointed out that the medical record does not contain any documentation of clinical and diagnostic testing such as x-rays, MRI, computed tomography, bone scan, or nerve conduction studies, revealing any evidence of degenerative joint disease. (Tr. 19). The ALJ properly concluded that the absence of any diagnostic testing documenting the presence of degenerative joint disease is inconsistent with plaintiff's subjective allegations. (Id.).

The ALJ next discussed plaintiff's hepatitis C. The ALJ stated that, although plaintiff was diagnosed with chronic hepatitis C, there is no evidence of jaundice or chronic liver disease imposing significant limitations of function. (Tr. 19). The ALJ noted that in December 2002, Dr. King reported that a biopsy revealed hepatitis C with only "mild" inflammation and no evidence of cirrhosis. (Tr. 19, 293). The ALJ stated that the record does not document any significant worsening or progression of plaintiff's hepatitis C or any findings by a treating physician that plaintiff's hepatitis C imposes any significant limitations of function. (Tr. 19). The ALJ thus concluded that plaintiff's hepatitis C does not cause any significant limitations of function. (Id.).

The ALJ next discussed plaintiff's anxiety and depression. The ALJ pointed out that although Dr. Till reported that plaintiff had a depressed and anxious affect on February 25, 2005, and on June 22, 2005, he did not diagnose plaintiff with a mental impairment. (Tr. 20, 285, 262). The ALJ also noted that consultative psychologist Dr. Larsen did not diagnose plaintiff with a mental impairment other than borderline intellectual functioning. (Tr. 20, 370-72). Dr. Larsen also assessed a GAF of 70, which indicates only mild symptoms. (Id.). The ALJ also noted that plaintiff has never sought treatment from a mental health professional. (Tr. 20).

The ALJ next discussed the side effects of plaintiff's medications. The ALJ noted that the medical records do not contain any physician's findings that plaintiff has suffered persistent and adverse side effects due to his medications, resulting in limitations of function. (Tr. 20). The absence of side effects from medication is a proper factor to be considered in evaluating subjective complaints of pain. See McKinney v. Apfel, 228 F.3d 860, 864 (8th Cir. 2000).

The ALJ pointed out that plaintiff's past work ceased because plaintiff tested positive for cocaine. (Tr. 21). The ALJ properly found that plaintiff's loss of his job due to drug use rather than his impairments failed to bolster his credibility.

The ALJ next discussed inconsistencies in plaintiff's statements. The ALJ noted that plaintiff made inconsistent statements to a consultative examiner Dr. Larsen regarding his alcohol use. (Tr. 21, 370, 347). The ALJ also pointed out that plaintiff testified that he had not consumed alcohol since a DWI several years prior to the hearing. (Tr. 21, 402, 409). Plaintiff's girlfriend, however, testified that plaintiff had last consumed alcohol only four weeks prior to the hearing. (Tr. 21, 425). The ALJ properly found that plaintiff's failure to be forthcoming to the consultative examiner and the Social Security Administration further undermines his credibility. (Tr. 21).

The ALJ also discussed plaintiff's activities of daily living. (Tr. 21). He stated that although plaintiff has alleged many significant limitations of daily activities, these allegations are not self-proved, and are found to be not credible in light of the factors previously discussed. (Id.).

Finally, the ALJ discussed plaintiff's work record. The ALJ stated that plaintiff had steady earnings from 1976 through 1998, and no work activity since 1999. Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in

assessing credibility.  See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).  A poor work history prior to the alleged onset of disability lessens the credibility of a plaintiff's allegations of disabling pain.  See Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints.  See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).  In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence.

## 3.    Residual Functional Capacity

Plaintiff argues that the ALJ erred in formulating his residual functional capacity. Specifically, plaintiff contends that the ALJ failed to consider the assessments of Dr. Bennie Till and Dr. W. H. Elliott in determining plaintiff's residual functional capacity.  Defendant argues that the ALJ properly formulated plaintiff's residual functional capacity.

After properly assessing plaintiff's credibility, the ALJ made the following determination regarding plaintiff's residual functional capacity:

> [t]hus, in light of the above, the undersigned finds not credible the claimant's description of his symptoms and limitations of function.  The undersigned finds that the record establishes that the claimant's impairments preclude, at most: frequently lifting and carrying more than ten pounds; occasionally lifting and carrying more than twenty pounds; standing and/or walking more than six hours in an eight hour work day; sitting more than six hours out of an eight hour work day; and performing more than simple repetitive work. These findings are consistent with the claimant's past relevant work, his borderline intellectual functioning, his hypertension, and breathing impairment.

(Tr. 21-22).

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). This is to be contrasted with the axiom that "the opinion of a consulting physician who examines claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589). Opinions of treating physicians may be discounted or disregarded where other medical "assessments are supported by better or more thorough medical evidence." Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997). An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson, 240 F.3d at 1148.

Plaintiff argues that the ALJ erred in failing to consider the Physical Residual Functional Capacity Assessment of plaintiff's treating physician Dr. Till. Dr. Till expressed the opinion that plaintiff could sit for six hours in an eight-hour workday, stand for three hours in an eight-hour workday, walk for three hours in an eight-hour workday, and work for three hours in an eight-hour workday. (Tr. 267). Dr. Till found that plaintiff could frequently lift up to ten pounds, occasionally lift up to twenty pounds, and could never lift more than twenty pounds. (Id.). Dr. Till stated that plaintiff can frequently carry up to twenty pounds, and can never carry more than twenty pounds. (Id.). Dr. Till indicated that plaintiff could not use his left foot for repetitive movements as in operating foot controls. (Tr. 268). Dr. Till found that plaintiff is able to

frequently bend and reach above, but cannot squat, crawl, climb, stoop, crouch, or kneel.  (Id.).

Dr. Till found that plaintiff could be exposed to noise continuously; could occasionally be around

moving machinery, and drive automotive equipment; and could never be exposed to unprotected

heights, marked temperature changes, or be exposed to dust, fumes, and gases.  (Tr. 270).  Dr.

Till indicated that plaintiff's depression, weakness, and hepatitis C, serve as medical reasons that

plaintiff should not work.  (Tr. 272).

     Contrary to plaintiff's allegation, the ALJ did not ignore Dr. Till's assessment.  Rather, the

ALJ discussed Dr. Till's opinion and then explained why he was assigning it little weight.  The

ALJ stated that Dr. Till's findings appear inconsistent with the medical treatment notes, including

his own, which repeatedly document that plaintiff was in no acute distress and document that

plaintiff was without significant deficits in strength, reflexes, muscle tone, and coordination.  (Tr.

23).  The ALJ also noted that Dr. Till's findings are inconsistent with the medical records, which

do not document ongoing diagnoses of depression or other mental impairments and do not

document more than a few months of complaints or observations of depression or anxiety.  (Tr.

23).  The ALJ stated that Dr. Till's findings regarding plaintiff's degenerative joint disease appear

inconsistent with the objective findings within his own treatment notes, the remainder of the

medical notes, and the absence of diagnostic studies documenting such.  (Id.).  Finally, the ALJ

noted that Dr. Till's assessment was not created for the purpose of treatment but was created for

the purpose of litigating a claim for benefits.  (Id.).  The ALJ indicated that due to the above

reasons, he was assigning little weight to Dr. Till's assessment and greater weight to the

remainder of the record.  (Id.).  Thus, the undersigned finds that the ALJ provided sufficient

reasons for assigning little weight to Dr. Till's opinion.

Plaintiff also contends that the ALJ erred in failing to consider the opinion of Dr. W.H. Elliott. Plaintiff saw Dr. Elliott on January 21, 2002, with complaints of recurrent episodes of chest pain. (Tr. 339). Upon physical examination, plaintiff's blood pressure was very high, his lungs were clear, and he had a regular heart rate and rhythm without murmur. (Id.). Dr. Elliott's assessment was chest pain suggestive of new onset angina, uncontrolled hypertension, recent hematuria, and dyspnea that may represent some underlying degree of congestive heart failure or lung dysfunction. (Id.). Dr. Elliott stated that plaintiff needed extensive further testing and expressed the opinion that plaintiff be considered disabled for a one-year period so he can undergo testing. (Id.). The ALJ acknowledged the opinion of Dr. Elliott, yet noted that an October 2002 electrocardiogram was normal. (Tr. 16, 301 339). Further, Dr. Elliott did not express the opinion that plaintiff was permanently disabled but, rather, suggested that plaintiff be considered disabled for a one-year period so that he could undergo further testing to determine the severity of his impairments. Thus, the ALJ properly discredited the opinion of Dr. Elliott.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

The ALJ's residual functional capacity assessment is supported by the record as a whole, including the objective medical evidence. The objective medical record is consistent with the ability to perform light work. Although Dr. Till ultimately expressed the opinion that plaintiff was disabled, he found that plaintiff was capable of lifting ten pounds frequently and twenty pounds occasionally, and that he could sit for six hours in an eight-hour workday. (Tr. 267). These limitations are consistent with the ALJ's residual functional capacity determination. The record is not supportive of any greater restriction due to plaintiff's impairments. Further, plaintiff testified he stopped working at his last job because he tested positive for cocaine use, rather than due to his impairments. (Tr. 400).

**4.    Vocational Expert Testimony**

Plaintiff argues that the ALJ erred by improperly relying on vocational expert testimony. Specifically, plaintiff argues that the hypothetical question posed to the vocational expert was erroneous because it did not include plaintiff's illiteracy. Defendant contends that the ALJ properly posed a hypothetical question to the vocational expert based on all of plaintiff's limitations he found supported by the record.

Testimony from a vocational expert based on a properly phrased hypothetical question constitutes substantial evidence upon which to base an award or denial of Social Security benefits. See Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001). "A hypothetical question posed to [a] vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). It must "capture the concrete consequences of the claimant's deficiencies." Id. (citing Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997)).

Here, the ALJ submitted written interrogatories to vocational expert Stephen Dolan, after the hearing. (Tr. 22, 139-41). The hypothetical question presented to Mr. Dolan contained the same limitations as the ALJ's residual functional capacity assessment. (Tr. 140). Mr. Dolan indicated that such a hypothetical individual could not perform plaintiff's past work but could perform other work as a housekeeping cleaner, cafeteria attendant, and poultry eviscerator. (Tr. 134).

The undersigned has found that the residual functional capacity formulated by the ALJ is supported by substantial evidence. The ALJ discredited plaintiff's allegations of illiteracy due to plaintiff's completion of the twelfth grade, failure to submit school records, and ability to work successfully for 26 years as a cemetery worker. (Tr. 14). In addition, plaintiff has indicated in reports that he is able to read English and is able to write more than his name in English. (Tr. 58, 217). The ALJ took into consideration plaintiff's diagnosis of borderline intellectual functioning in restricting plaintiff to simple, repetitive work. The hypothetical question posed to the vocational expert was based upon this residual functional capacity. The ALJ properly used vocational expert testimony to determine that plaintiff could perform other work existing in significant numbers in the economy.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this   27th   day of September, 2007.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE